In the
 Missouri Court of Appeals
 Western District
L.M.D., )
 )
 Respondent, ) WD83816
 )
v. ) OPINION FILED: April 6, 2021
 )
ROBERT W. GAUERT, )
 )
 Appellant. )

 Appeal from the Circuit Court of Callaway County, Missouri
 The Honorable J. Hasbrouck Jacobs, Judge

 Before Division Three: Karen King Mitchell, Presiding Judge, Gary D. Witt, Judge and
 Anthony Rex Gabbert, Judge

 Robert Gauert ("Gauert") appeals from the judgment of the Circuit Court of

Callaway County entering a full order of protection in favor of L.M.D.1 We reverse and

vacate the judgment.

 1
 Pursuant to section 595.226 RSMo (2016), we refer to the victim, the victim's husband, and the victim's
hired hand by their initials because the circuit court found all three were victims of stalking. In addition to the
Petition for an Order of Protection that L.M.D. filed against Gauert that is at issue in the appeal before us, Gauert
filed a Petition for an Order of Protection against L.M.D. Gauert's Petition against L.M.D. was denied and that
ruling has not been appealed. In addition, R.D., L.M.D.'s husband, and G.G., L.M.D.'s and R.D.'s hired hand, also
filed separate Petitions for Orders of Protection against Gauert, which were granted, and the grant of relief to R.D.
and G.G. have been separately appealed in case numbers WD83817 and WD83815. Further, due to the interrelated
facts, all of these matters were tried together, but the cases were not consolidated. Facts that were adduced at the
trial but are unrelated to L.M.D.'s claims against Gauert are omitted from this opinion so as not to confuse the issues
relevant to this appeal with unrelated issues of the other causes of action.
 Factual and Procedural Background2

 L.M.D. is married to R.D., and they purchased their farm in 2008. Because their

farm was landlocked, they obtained an easement across property owned by a third party,

the "Saddle Club." L.M.D.'s and R.D.'s property adjoins Gauert's farm, which he

purchased in 2010. There has been a longstanding dispute between L.M.D. and R.D. and

Gauert, which started over Gauert's use of L.M.D.'s and R.D.'s easement across the

Saddle Club property. The easement is located next to Gauert's property line.

 In May of 2011, Gauert called L.M.D. a "bitch" and a "whore" when she was

retrieving her mail. As R.D. was driving home, he saw the encounter, intervened by

pulling L.M.D. away from Gauert, and approached Gauert. R.D. and Gauert postured as

though they were going to fight, and L.M.D. pulled R.D. away from Gauert. No physical

confrontation ensued.

 Gauert and L.M.D. and R.D. had another argument later in 2011, regarding

Gauert's use of the easement across the Saddle Club's property. The Saddle Club and

R.D. agreed to install a fence along the easement to prohibit Gauert from using the

easement to enter his property. While R.D. was installing the fence, Gauert cursed at

R.D. and argued that the fence could not be installed in that location because it was on

Gauert's property. Gauert called the Callaway County Sheriff's Department, and Deputy

Alan Lebel ("Deputy Lebel") was dispatched. Deputy Lebel determined that R.D. was

installing the fence on property where he had the right to do so, and that Gauert did not

 2
 When reviewing a court-tried case, we view the facts and reasonable inferences in a light most favorable
to the judgment. Hanger v. Dawson, 584 S.W.3d 798, 800 (Mo. App. W.D. 2019).

 2
have a right to interfere. Gauert got in his vehicle and drove over L.M.D.'s and R.D.'s

trash can as he went to his house. L.M.D. and R.D. were standing approximately twenty

feet away from the trash can at the time. R.D. requested Deputy Lebel to arrest Gauert

for property damage, and Deputy Lebel took Gauert into custody.

 On one occasion in 2012 or 2013, L.M.D. approached Gauert in a hardware store

and shook Gauert's hand. Gauert did not recognize L.M.D. at first because L.M.D. had

recently changed her hairstyle. When L.M.D. identified herself, Gauert withdrew his

hand and "started yelling, and [Gauert] made such a scene in the middle of [the hardware

store]." L.M.D. testified that Gauert said:

 You need to stay away from me. You and your husband, stay away from
 me. Leave my people alone. I have filed . . . harassment charges of some
 sort with the local authorities.

L.M.D. immediately found her husband several aisles away and left the store without

further incident.

 While there was testimony as to other events in 2015, when L.M.D. and R.D. were

out of state on a business trip, L.M.D. acknowledged she speculated and had no proof

that Gauert committed any of these other acts, as she was 2,000 miles away at the time

and there were no witnesses to the acts.

 On June 29, 2019, Gauert had a bonfire on his property. As L.M.D. and R.D. were

leaving for dinner at approximately 9:00 p.m., they saw the bonfire and could not tell

whether it was on their property or another neighbor's property. L.M.D. and R.D. used an

ATV to investigate and reported the fire to the local fire department. After determining

the fire was not on their own property, they crossed Gauert's property in the ATV to

 3
investigate if the fire was on another neighbor's property. While they were on Gauert's

property, Gauert drove his truck towards L.M.D. and R.D. to chase them off of his

property coming within three feet of their ATV. Gauert stopped his vehicle at the edge of

his property and did not pursue L.M.D. and R.D. once they left his property. L.M.D. and

R.D. contacted the Callaway County Sheriff's Department to report the alleged assault,

but no arrests were made. The local fire department did not engage in any firefighting

activity and no citations were issued to Gauert, but the fire department requested that

Gauert report any future fires on his property so the department would know how to

respond to calls.

 On July 22, 2019, R.D. was working along the fence line, and Gauert began to

taunt R.D. L.M.D. was behind some trees and recorded the encounter on a cell phone.

At the end of the encounter, Gauert told R.D., "[Y]ou're a coward, you need to defend

yourself and defend your wife." When asked whether she felt threatened by that

statement, L.M.D. testified, "Absolutely."

 On August 14, 2019, L.M.D. and G.G., L.M.D.'s and R.D.'s hired hand, were

bathing a horse in L.M.D.'s and R.D.'s pasture approximately twenty-five yards from the

property line to Gauert's property. G.G. had her dog with her, which was off-leash and

wandered onto Gauert's property. L.M.D. heard a gunshot from a small caliber firearm,

but she did not think anything of it because it is not unusual to hear gunshots in the rural

area where they live. G.G. noticed her dog was missing and looked through trees that

lined the fence-line between Gauert's property and the pasture she was in and saw her dog

lying dead on Gauert's property. Neither L.M.D. nor G.G. saw the shooting or the events

 4
leading up to it. Immediately, L.M.D. and G.G. went to the property line and telephoned

the Callaway County Sheriff's Department. While waiting for law enforcement to arrive,

Gauert moved the dog's body away from the middle of his yard so it was closer to his

porch and removed the dog's collar. Gauert testified G.G.'s dog was being aggressive

towards Gauert's cats, and Gauert retrieved a .22 caliber rifle. Gauert testified that after

he returned with the rifle, G.G.'s dog showed his teeth to Gauert, and Gauert shot the dog

for his own protection. Gauert did not threaten L.M.D. or leave his property during the

killing of G.G.'s dog or afterwards.

 Two weeks later on September 4, 2019, L.M.D. filed a petition seeking an order of

protection based on an allegation of stalking. The circuit court conducted a bench trial on

January 23, 2020, and entered its judgment granting L.M.D. a full order of protection

against Gauert ("Judgment") on that date. The Judgment prohibited Gauert from coming

within fifty feet of L.M.D.; communicating with L.M.D. in any fashion; harassing,

stalking, or threatening L.M.D.; and using, attempting to use, or threatening to use

physical force against L.M.D. The Judgment further ordered Gauert not to possess

firearms while the Judgment is in effect. The circuit court also found that it was in the

parties' best interests that the Judgment automatically renew after one year; thus, the

Judgment is effective until January 22, 2022. After various post-trial motions were filed,

heard, and ruled on, the Judgment became final on May 20, 2020. This timely appeal

followed.3

 3
 L.M.D. did not file a brief or participate in this appeal in any fashion.

 5
 Discussion

 Gauert raises two claims of error. First, he asserts that the circuit court erred in

granting the Judgment because the record lacks substantial evidence to support it, in that

L.M.D. failed to prove all of the elements required to establish stalking under the Adult

Abuse Act ("Act").4 Second, he argues the circuit court erred in ordering that Gauert not

possess firearms during the pendency of the Judgment because the circuit court exceeded

its jurisdiction in that the Act does not provide for a remedy of prohibiting the possession

of firearms except when the parties are "intimate partners." Because Gauert's first point

on appeal is dispositive, we do not address his second point.

 Standard of Review

 We review orders of protection under the Act "the same as in any other court-tried

case; we will uphold the trial court's judgment as long as it is supported by substantial

evidence, is not against the weight of the evidence, and does not erroneously declare or

apply the law." M.N.M. v. S.R.B., 499 S.W.3d 383, 384 (Mo. App. E.D. 2016).

"Substantial evidence is evidence that, if believed, has some probative force on each fact

that is necessary to sustain the circuit court's judgment." Ivie v. Smith, 439 S.W.3d 189,

199 (Mo. banc 2014). We defer to the circuit court's credibility determinations and

consider the evidence in the light most favorable to the circuit court's judgment. Id. at

200.

 4
 Section 455.005, et seq. All statutory references are to the Revised Statutes of Missouri 2016 as currently
supplemented, unless otherwise indicated.

 6
 Analysis

 The Act provides that a person who has been subject to domestic violence or has

been the victim of stalking or sexual assault may seek an order of protection. Section

455.020.1. Because it is undisputed that L.M.D. and Gauert are not related and are not

members of the same household as defined by the Act, the Judgment could only be

entered if L.M.D. sufficiently demonstrated she was a victim of stalking by Gauert.

 The Act defines "[s]talking" as "when any person purposely engages in an

unwanted course of conduct that causes alarm to another person . . . when it is reasonable

in that person's situation to have been alarmed by the conduct." Section 455.010(14).

"'Course of conduct'" means a pattern of conduct composed of two or more acts over a

period of time, however short, that serves no legitimate purpose." Section

455.010(14)(b). "'Alarm' means to cause fear of danger of physical harm[.]" Section

455.010(14)(a). Therefore, to obtain relief under the Act, a petitioner must demonstrate

by a preponderance of the evidence: (1) that the respondent engaged in a pattern of

conduct of at least two or more acts, (2) which served no legitimate purpose, (3) causing

the petitioner to fear danger of physical harm, and (4) that the petitioner's fear was

reasonable. Binggeli v. Hammond, 300 S.W.3d 621, 624 (Mo. App. W.D. 2010)

(applying section 455.010(10)(a)-(c) RSMo 2000).5

 "[T]he stalking provision of the [Act] was not meant to be a panacea for the minor

arguments that frequently occur between neighbors." N.L.P. v. C.G.W., 415 S.W.3d 800,

 5
 Since Binggeli was decided, section 455.010 has been amended several times, but the definitions of
"stalking," "course of conduct," and "alarm" are substantially the same and are now contained within section
455.010(14)(a)-(c) RSMo. (2016).

 7
804 (Mo. App. E.D. 2013) (quoting C.H. v. Wolfe, 302 S.W.3d 702, 707 (Mo. App. W.D.

2009)).

 The potential for abuse of the stalking provision of the [Act] is great. And,
 the harm that can result is both real and significant, not the least of which
 will be the stigma that attaches by virtue of a person having found to be a
 stalker. Moreover, such a finding could lead to criminal prosecution for
 violation of the criminal stalking statute, [section] 565.225. Thus, it is
 incumbent that trial courts exercise great vigilance to prevent abuse of the
 stalking provisions in the [Act] and in making sure that sufficient credible
 evidence exists to support all elements of the statute before entering a
 protective order.

Wallace v. Van Pelt, 969 S.W.2d 380, 387 (Mo. App. W.D. 1998).

 L.M.D. alleged that Gauert engaged in the following acts:6 (1) calling L.M.D.

vulgar names near the mailbox, (2) driving over L.M.D.'s and R.D.'s trash can, (3) the

incident at the hardware store, (4) threatening L.M.D. while taunting R.D. at the fence

line, (5) following L.M.D. and R.D. in their ATV after the fire on Gauert's property, and

(6) shooting G.G.'s dog. We address the sufficiency of these incidents to determine if

they satisfy the four elements necessary to warrant the entry of full order of protection.

 L.M.D. failed to establish that Gauert committed some of the alleged acts.

 L.M.D. acknowledged she was merely speculating that Gauert committed the 2015

acts, while she was out of town "2,000 miles away"; she testified that these additional

acts had occurred, but those acts could not be attributed to Gauert. No witnesses saw

these acts committed and no evidence tied Gauert to these acts. Therefore, this testimony

 6
 The Judgment did not make any findings of fact pertaining to any of the alleged acts, and the Judgment
did not specify which events formed the pattern of conduct necessary to enter a full order of protection.

 8
is too vague and indefinite to support a conclusion that Gauert engaged in this conduct;

thus, we cannot consider these events as part of Gauert's "pattern of conduct."

 Following L.M.D. and R.D. while they were on Gauert's property served a

legitimate purpose.

 "An activity with a legitimate purpose is one that is sanctioned by law or custom

or is lawful or is allowed." C.B. v. Buchheit, 254 S.W.3d 210, 212 (Mo. App. E.D. 2008)

(citing Overstreet v. Kixmiller, 120 S.W.3d 257, 258 (Mo. App. E.D. 2003)). In

Missouri, trespass "is the unauthorized entry by a person upon another's land, regardless

of the degree of force used, and regardless of any damage done." Philips v.

Citimortgage, Inc., 430 S.W.3d 324, 330 (Mo. App. E.D. 2014). Landowners may

protect their property and use force to prevent stealing, property damage, or tampering.

Section 563.041.1. See Hartman v. Hoernle, 201 S.W. 911, 912 (Mo. App. 1918) ("there

can be no doubt that while defendant was entitled to resist the trespass upon his land[,] . .

. he was not warranted in using more force than was necessary to eject the trespassers or

to protect his property . . . ."). In the instant case, L.M.D. and R.D. unlawfully entered

Gauert's property on an ATV, and Gauert was within his rights to use reasonable force to

eject them from his land. The testimony only supports that Gauert followed L.M.D. and

R.D. in his truck until they left his property and that he stopped at the property line.

Therefore, this incident served a legitimate purpose and cannot form the basis of an order

of full protection.

 9
 L.M.D. failed to establish she subjectively feared physical danger during

some of the events.

 In Schwalm v. Schwalm, 217 S.W.3d 335, 337 (Mo. App. E.D. 2007), the court

held that "a plaintiff is required to do more than simply assert a bare answer of 'yes' when

asked if [he or she] was alarmed." A husband and wife were litigating a dissolution of

marriage action. Id. at 336. Husband had filed a petition for an order of protection

against Wife, which alleged that Wife had knocked on his door, followed him in her car,

and "hung around" his work. Id. Wife peaceably left when Husband refused to answer

the door, and she moved her car when asked by Husband. Id. at 337. Wife had never

threatened Husband. Id. Husband did not provide any proof of the reasonable fear of

physical harm and "failed to testify that he was afraid of Wife and, specifically, afraid of

physical harm." Id. at 337.

 Furthermore, in C.L. v. Hartl, 495 S.W.3d 241, 244 (Mo. App. W.D. 2016), we

held that when C.L. testified she "felt safe" during one encounter with her stalker, her

actions demonstrated she subjectively feared physical danger. Her stalker knocked on

her door for thirty minutes while talking loudly to her through her door, called her twice

leaving voicemails, and parked his car blocking her driveway preventing C.L. from

leaving in her car. Id. at 242. During this incident, C.L. had set her alarm and brought

her dog next to her. Id. at 244. We concluded these precautionary measures were

sufficient to prove by a preponderance of the evidence that C.L. feared physical danger in

that instance.

 10
 Just as in Schwalm, L.M.D. did not testify that she feared a danger of physical

harm during the incident where Gauert shot G.G.'s dog. L.M.D. did not see him shoot the

dog and thought nothing of the small caliber gun shot because gun shots are commonly

heard in their rural area. Additionally, unlike in C.L., L.M.D. did not take any

precautionary measures. L.M.D. ran toward what would have been the danger rather than

moving away from it, and L.M.D. remained standing along the fence line while waiting

for the Callaway County Sheriff's Office to respond, which indicates L.M.D. did not fear

a danger of physical harm in that particular instance.

 Similarly, during the incident at the fence line where Gauert taunted R.D., L.M.D.

testified that she "absolutely" felt threatened during the incident. However, just an in

Schwalm, this bare assertion that she felt threatened is insufficient, and L.M.D. did not

take any precautionary measures that demonstrates she feared a danger of physical harm

because she remained in the situation for several minutes and recorded the entire

conversation between R.D. and Gauert.

 Furthermore, L.M.D. did not testify in regard to the incident where Gauert drove

over L.M.D.'s and R.D.'s trash can, and there was no evidence that she was subjectively

afraid in this situation. There was no evidence of how she responded in the situation,

which occurred in the presence of Deputy Lebel. Therefore, L.M.D. failed to

demonstrate she subjectively feared physical harm during the encounter, and even if she

was afraid, that fear would have been unreasonable because the incident occurred in the

presence of Deputy Lebel and because Gauert was driving away from L.M.D.

 11
 During the incident at the hardware store, the testimony only established that

L.M.D. approached Gauert and shook his hand before Gauert recognized her and yelled:

 You need to stay away from me. You and your husband, stay away from
 me. Leave my people alone. I have filed . . . harassment charges of some
 sort with the local authorities.

The incident in the hardware store does not constitute a threat and was in fact a demand

by Gauert that L.M.D. stay away from him and leave him alone.

 Furthermore, L.M.D. initiated the conversation with Gauert in the hardware store.

In Fowler v. Minehart, 412 S.W.3d 917, 918 (Mo. App. S.D. 2013), Fowler petitioned for

a full order of protection against Minehart. Fowler worked with Minehart's wife at a

school, and Fowler made a disciplinary complaint against Minehart's wife. Id. Minehart

made a threatening phone call to Fowler stating, "I'm going to come get you. I'm going

to get even with you. I'll catch you off school campus and I'll take care of you." Id. at

919. Later that same day, Fowler requested to speak to Minehart and the two had a

"'heated conversation,' during which Minehart said, '[y]ou wait till you leave the school

property' and pointed his finger at Fowler." Id. The Court held that because Fowler

wanted to speak with Minehart during the second conversation, that conversation could

not qualify as an "unwanted communication" or "unwanted contact" as required by the

Act. Id. at 922. Similarly, the conversation between Gauert and L.M.D. in the hardware

store was not "unwanted" because L.M.D. sought out Gauert and initiated the interaction

and Gauert's response to the interaction was not threatening.

 12
 Therefore, because L.M.D. did not establish she subjectively feared a danger of

physical harm during these events, these events cannot be considered to determine if

Gauert's pattern of conduct met the requirements of the Act.

 A reasonable person would not have feared a danger of physical harm during

the remaining incident.

 Only one incident remains that could be used to establish a reasonable fear of

Gauert's actions was when Gauert threatened L.M.D. and called her vulgar names near

the mailbox. This incident occurred in May of 2011, more than nine years before this

action was filed, Gauert confronted L.M.D., calling her a "bitch" and a "whore" as she

was retrieving her mail. R.D. intervened by pulling L.M.D. away from Gauert and

approached Gauert. R.D. and Gauert postured as though they were going to fight, and

L.M.D. pulled R.D. away from Gauert. No physical confrontation ensued. During this

one incident, Gauert was offensive and used incredibly inappropriate language, but he did

not threaten L.M.D. Further the extensive length of time that passed between this

incident and the filing of the petition establishes that this incident, without more, did not

cause her to fear physical harm.

 Even if we were to find that this remaining incident where Gauert made

derogatory comments to L.M.D. at the mailbox was sufficiently threatening to cause

L.M.D. to fear physical harm and would have caused a reasonable person to fear physical

harm, one incident alone is insufficient to prove stalking under the Act. Fowler, 412

S.W.3d at 922.

 13
 Conclusion

 The Judgment is reversed and vacated in its entirety.7

 __________________________________
 Gary D. Witt, Judge

All concur

 7
 The fact that the law requires reversal in this case should not be read to indicate we condone Gauert's
reprehensible behavior.

 14